**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Otter Tail Power Company;                           Civil No. 11-1070 (DWF/LIB)
Minnetonka Power Cooperative, Inc.;
ALLETE, Inc. d/b/a, Minnesota Power;
Northern States Power Company,
a Minnesota Corporation; and Great River
Energy,

                    Plaintiffs,

v.                                                   **MEMORANDUM**
                                                     **OPINION AND ORDER**

Leech Lake Band of Ojibwe, its
Reservation Business Committee, and
Reservation Business Committee Members
Arthur "Archie" LaRose, Eugene "Ribs"
Whitebird, Robbie Howe-Bebeau and Steve
White in their Official Capacities as Reservation
Committee Members,

                    Defendants.

_____

Kevin C. Quigley, Esq., Hamilton Quigley & Twait PLC; and Michael C. Krikava, Esq.,
Samuel L. Hanson, Esq., and Thomas Erik Bailey, Esq., Briggs & Morgan, PA, counsel
for Plaintiffs.

Zenas Baer, Esq., Zenas Baer & Associates, counsel for Defendants.

_____

**INTRODUCTION**

This matter is before the Court on a Motion for Temporary Restraining Order and

Immediate Preliminary Injunctive Relief brought by Plaintiffs (the "Utilities").  The

Utilities seek a declaration that Defendants Leech Lake Band of Ojibwe, its Reservation

Business Committee, and Reservation Business Committee Members Arthur "Archie" LaRose, Eugene "Ribs" Whitebird, Robbie Howe-Bebeau and Steve White  (collectively, the "Tribe") lack the authority to regulate or prohibit the Utilities' high-voltage transmission line construction project from Bemidji to Grand Rapids, Minnesota (the "Project"), and therefore that the Utilities are not required to obtain the Tribe's consent to proceed with the Project.  For the reasons set forth below, the Utilities' motion is granted.

## BACKGROUND

The Utilities provide electric service in Minnesota and various regions in other nearby states.  (Compl. ¶¶ 1-5.)  The Reservation Business Committee ("Tribal Council") is the governing body of the Leech Lake Band of Ojibwe ("LLBO"), one of six member Bands of the Minnesota Chippewa Tribe, a federally recognized Indian tribe pursuant to 25 U.S.C. § 479a-1.  (Compl. ¶ 6.)  Arthur "Archie" LaRose is the Chair of the Tribal Council, and District Representatives Eugene "Ribs" Whitebird, Robbie Howe-Bebeau, and Steve White are members of the Tribal Council.  (*Id*. ¶ 7.)

In July 2009, the Minnesota Public Utilities Commission ("MPUC") granted a certificate of need for the Project, explaining that the Project is necessary to restore reliable utility services to the region.  (Aff. of Thomas Erik Bailey ("Bailey Aff.") ¶ 8, Ex. C at 4-8.)

In September 2010, the Tribe and the Utilities entered into a Settlement Agreement.  The Settlement Agreement provides, in part:

> **WHEREAS**, Utilities have received a certificate of need from the Minnesota Public Utilities Commission ("MPUC") to build a 230 kV transmission line between Bemidji, Minnesota and Grand Rapids,

Minnesota (the "Project") to address electric demand growth and system
reliability needs in the Bemidji and Cass Lake areas;

> **WHEREAS**, Utilities are proposing to locate the Project within
> Applicants' Route, which is also referred to as Route 4, that bisects the
> Reservation but does not cross on or over tribal trust, allottee, or private fee
> lands of the Band;

> **WHEREAS**, Utilities recognize the Band's position that it retains
> hunting and gathering rights pursuant to treaty on lands within the
> Chippewa National Forest ("CNF") other than tribal trust, allottee, and
> private fee lands of the Band;

> **WHEREAS**, the Parties differ on what if any impacts the Project
> would have on tribal trust, allottee, and private fee lands of the Band, and
> on lands within the CNF on which the Band may retain hunting and
> gathering rights by treaty, and also differ on the value to place on any such
> impacts; and

> **WHEREAS**, the Parties recognize that the costs incurred by
> Utilities in connection with this Agreement are reasonable and prudent
> costs of the Project that are necessary to gain the Band's voluntary
> agreement to the Project's construction, operation, and associated
> mitigation measures, and the Parties seek through this Agreement to avoid
> the considerable additional cost in time and money involved in resolving
> their differences instead through litigation in regulatory and/or court
> proceedings.

(Aff. of Zenas Baer in Supp. of Mot. to Dismiss ("Baer Aff. I") ¶3(a) at Ex. 1 at 50-60.)[1]

The Settlement Agreement also provides that it "is a settlement of potential claims that

the Utilities dispute and therefore does not establish a consensual relationship between

---

[1]     While the Utilities have consistently maintained that the Project does not cross on
or over tribal trust land, the Tribe contends that the Utilities have recognized the Tribe's
position that it has hunting and gathering treaty rights that extend beyond tribal trust land
within the Reservation.  The Tribe contends that the Settlement Agreement was
negotiated to compensate the Tribe for harm caused by the Project on such rights.  The
Utilities contend that they thought they had a "nonconsensual" jurisdictional dispute
settlement, and that they entered into the Settlement Agreement to avoid litigation.

the Band and Utilities, nor directly impact the political integrity, economic security, or

health and welfare of the Band.  (*Id*. at 53, ¶ 7.)

In November 2010, the MPUC issued a high voltage transmission line route

permit for the placement of the Project ("Route Permit").  (Bailey Aff. ¶ 9, Ex. D.)  The

approved route bisects the historical eastern and western exterior boundaries of the Leech

Lake Reservation (the "Reservation"), but does not cross over any tribal trust lands of the

LLBO or the Minnesota Chippewa Tribe.  (Bailey Aff. ¶ 9, Ex. D at 60-61 (¶¶ 102-106).)

The Project was subject to environmental review by both state and federal agencies,

which was completed in September 2010.  (Bailey Aff. ¶ 4.)  Construction is scheduled to

begin in June or July of 2011.  (*Id*. ¶ 5.)

In January 2011, the Bureau of Indian Affairs confirmed that the Project's route

for the transmission lines does not affect any Tribal/Allotted Trust Lands within the

exterior Boundaries of the Leech Lake Reservation.  (Bailey Aff. ¶ 10, Ex. E.)  In March

2011, the Chief of Staff of the Rural Utilities Service ("RUS") sent a letter to

Arthur "Archie" LaRose in response to the Tribe's request that RUS cease further action

to fund the Project because RUS did not adequately consult with the Tribe.  (*Id*. ¶ 11,

Ex. F.)  In the letter, RUS rejected the request and indicated that it believed that RUS had

engaged in meaningful consultation.  (*Id*.)  The Tribe also requested that the United

States Department of Agriculture, Forest Service, Chippewa National Forest office

("CNF") revoke the easement.  The CNF declined the request and explained that "there is

no legal basis for suspension, revocation, or immediate suspension of the easement."  (*Id*.

¶ 12, Ex. G.)  In March 2011, the Tribe filed a petition with the MPUC to revoke the

Route Permit, claiming that the Tribe has regulatory authority over the Utilities and that the Utilities are required to obtain the Tribe's consent to locate the transmission line within the historic boundaries of the Reservation.  ("Baer Aff. I ¶ 5, Ex. E.)  This petition is pending before the MPUC.

On or about April 25, 2011, the Utilities commenced this action in response to the Tribe's petition before the MPUC.  The Utilities assert a single count for declaratory judgment.  Specifically, the Utilities seek a declaration (1) that the Utilities are not required to obtain the LLBO's consent, through the Tribal Counsel or otherwise, to locate the Project within the historic boundaries of the Reservation when the Project does not cross on or over or impact Tribal trust or allottee land; and (2) that the LLBO's assertion of regulatory authority over the Project constitutes an illegal restraint on alienation of non-Indian fee simple lands within the historic exterior boundaries of the Reservation. (Compl. ¶¶ 38-39.)

In response to the Complaint, the Tribe filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction, Failure to State a Claim Upon Which Relief Can Be Granted. That motion is scheduled to be heard by the Court on September 16, 2011.[2]  The Tribe

---

[2]     The Tribe argues that the LLBO is a sovereign nation and has not consented to this suit and therefore that this action must be dismissed for failure to state a claim and for lack of subject matter jurisdiction.  In its opposition to this motion, the Tribe offers only a brief argument without analysis and fails to demonstrate that this suit—which seeks prospective injunctive relief to remedy the alleged unlawful exercise of tribal court jurisdiction—violates principles of sovereign immunity.  *See, e.g.*, *Big Horn County Elect. Coop., Inc. v. Adams*, 219 F.3d 944, 954 (9th Cir. 2000) ("[S]uits for prospective injunctive relief are permissible against tribal officers under the *Ex Parte Young* framework."). The Court will take up the Tribe's sovereign immunity arguments on its motion to dismiss.

also served the Utilities with a Tribal Court complaint.  (Bailey Aff. ¶ 6, Ex. B.)  In the

Tribal Court complaint, the Tribe seeks to have a Tribal Court assert both adjudicatory

and regulatory authority over the Utilities and seeks a declaration that the Tribe's consent

is required before the Utilities are authorized to cross the Tribe's historic boundaries.  (*Id.*

¶ 62.)

## DISCUSSION

### I.    Legal Standard

Under Eighth Circuit precedent, a preliminary injunction may be granted only if

the moving party can demonstrate:  (1) a likelihood of success on the merits; (2) that the

movant will suffer irreparable harm absent the restraining order; (3) that the balance of

harms favors the movant; and (4) that the public interest favors the movant.  *See*

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).  None of the

factors by itself is determinative; rather, in each case, the factors must be balanced to

determine whether they tilt toward or away from granting injunctive relief.  *See West*

*Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986).  The party

requesting the injunctive relief bears the "complete burden" of proving all of the factors

listed above.  *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

### II.    Likelihood of Success on the Merits

The first *Dataphase* factor requires that the movant establish a substantial

probability of success on the merits of its claim.  *See Dataphase*, 640 F.2d at 114.  The

Utilities assert that they will prevail on their claim that the Tribe has no regulatory

jurisdiction over the Project based on federal law under *Montana v. United States*, 450

U.S. 544 (1981) and its progeny.

### A.      The Tribe's Regulatory Authority

The parties agree that the Tribe's regulatory authority over nonmembers, such as the Utilities, is governed by the principles set forth in *Montana*, which the Supreme Court has called the "pathmarking case" on the subject.  *See Nevada v. Hicks*, 533 U.S. 353, 358 (2001) (citing *Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997)).  Under *Montana*, the civil jurisdiction of a tribal court generally does not extend to the activities of nonmembers of the tribe.  *Montana*, 450 U.S. at 565.  In *Montana*, the Supreme Court explained with respect to nonmembers on non-Indian fee land that the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." *Id.* at 564.  The Supreme Court also noted two possible exceptions, namely that a tribe may (1) regulate the activities of nonmembers who enter into consensual relationships with the tribe or its members through commercial dealing, contracts, leases, or other arrangements; or (2) retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when the conduct threatens or has some direct effect upon the political integrity, economic security, or health or welfare of the tribe.  450 U.S. at 565-66.  In *Plains Commerce Bank v. Long Family Land and Cattle Co.*, 554 U.S. 316 (2008), the Supreme Court explained that because "efforts by a tribe to regulate nonmembers . . . are presumptively invalid," a tribe bears the burden of showing that its assertion of jurisdiction falls within one of the *Montana* exceptions.  554 U.S. at 330 (internal quotations omitted).  The Supreme Court

7

also noted that the exceptions to *Montana* are narrow ones and "cannot be construed in a manner that would 'swallow the rule.'"  *Id*. (quotation omitted).

Here, it is undisputed that the Utilities are nonmembers of the Tribe.  Moreover, on the record before it, the Court concludes that the Utilities are likely to prevail in showing that the route of the Project's transmission line does not touch upon or cross any tribal-owned or tribal-allottee trust lands.[3]  Therefore, in order for the Tribe to exercise any regulatory or adjudicatory jurisdiction over the Utilities, they must demonstrate that one of the *Montana* exceptions apply.  *See, e.g.*, *Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997) (noting that as to nonmembers, a tribe's adjudicatory authority is at most as broad as its regulatory authority).

The Tribe argues that it meets both of the exceptions under *Montana* and may exercise jurisdiction over the Utilities.  In particular, the Tribe argues that the Utilities entered into a consensual relationship with the Tribe by requesting a Route Permit and signing the Settlement Agreement.  In addition, the Tribe argues that the treaty rights bargained away in the Settlement Agreement are rights that threaten or directly affect the

---

[3]     The Tribe attests that the route of the Project's transmission line does crossover, impact, and touch upon "tribally owned or tribal member lands and trust lands within the historic exterior boundaries of the Reservation."  (Aff. of Levi Brown ("Brown Aff.") ¶¶ 7, 8.)  In support, the Tribe submits evidence that the Project's route will cross lands owned by Tribal members.  (*Id*.)  The attached exhibits demonstrate that some tribal members may individually hold a fee simple interest in some parcels of land on the Project's route.  (*Id*.; Supp. Aff. of Erik Bailey ("Bailey Supp. Aff.") ¶¶ 5-9, Exs. 1-5.)  The Tribe, however, does not demonstrate how it could properly exercise the power to exclude over these parcels, and the authority cited by the Utilities supports the proposition that the Tribe cannot exercise such power.  The Supreme Court has rejected tribal authority to regulate nonmembers' activities on land over which the tribe could not "assert a landowner's right to occupy and exclude."  *Nevada*, 533 U.S. at 359-60.

Tribe's political integrity, economic security, health, or welfare.  In support of both of its

arguments, the Tribe relies heavily on the parties' execution of the Settlement

Agreement.

After reviewing the record and the relevant authority, the Court concludes that the

Utilities are likely to prevail in demonstrating that the Tribe has no regulatory jurisdiction

over the Project based on federal law under *Montana* and that the Tribe's reliance on the

Settlement Agreement does not demonstrate the existence of Tribal jurisdiction.  First,

the Tribe has repeatedly and consistently claimed that the Settlement Agreement is null

and void and without any legal effect.  (Aff. of Zenas Baer Opposing TRO ("Baer Aff.

II") ¶ 1, Ex. 1 at 1 ("The document you call a 'settlement agreement' is merely ink on

paper, not an agreement."); at 5 ("Return to Sender – no agreement – come to the

table."); Bailey Aff. ¶ 6, Ex. B at ¶¶ 66-69 (Trial Court Compl.); Defs.' Mem. in Supp. of

Mot. to Dismiss (Doc. No. 8) at 6; Supp. Bailey Aff. ¶ 10, Ex. 6 (MPUC Transcript) at 11

("[T]here's no dispute on the tribe's standpoint, it was never authorized.") and 19 ("the

settlement agreement is null and void").  Based on these consistent representations, the

Court declines to allow the Tribe to rely on the Settlement Agreement to form the basis of

an alleged consensual relationship with the Utilities.[4]  Second, even if the Tribe had not

consistently denied the validity of the Settlement Agreement, the Settlement Agreement

expressly states that it cannot serve as a basis for a consensual relationship between the

---

[4]     Moreover, at most, the Settlement Agreement reflects the parties' desire to settle
disputed claims (including a dispute over jurisdiction) to avoid litigation.  It does not
necessarily follow that by agreeing to settle a dispute with the Tribe, the Utilities entered
into a consensual relationship.

Tribe and the Utilities.  (Baer Aff. I. ¶ 3, Ex. C at 50-60, ¶ 7.)  Finally, the record demonstrates a strong likelihood that the Utilities will be able to demonstrate that it did not directly enter into any commercial dealings or contracts with the Tribe in connection with the transmission line.  The Tribe has not pointed to any evidence in the record that would demonstrate otherwise.  Instead, it appears that any easement rights, construction contracts, or other agreements related to the construction of the Project are between the Utilities and federal or state agencies or with private land owners holding fee title to non-Indian lands within the Project Route.

The Tribe also argues that it meets the second *Montana* exception.  The Court disagrees.  The second *Montana* exception applies when non-Indians' conduct menaces the political integrity, economic security, or the health or welfare of the tribe.  *Montana*, 450 U.S. at 566.  The conduct must do more than injure the tribe—it must "imperil the subsistence" of the tribal community.  *Id.*  Here, the Tribe asserts that the Utilities' conduct in constructing the Project will disrupt its hunting, fishing, and gathering rights. While the record makes clear that there will be some impact on these rights, the record also demonstrates that the impacts will be limited in scope and duration.  The Tribe has failed to demonstrate how, under the relevant authority, the impairment of these rights via the construction of the Project will rise to a level of disruption that will imperil the subsistence of the Tribe's community.

Based on the above, the Court holds that the Tribe has not met its burden of demonstrating that either of the *Montana* exceptions apply.

**B.      Exhaustion of Tribal Remedies**

The Tribe argues that the Utilities must exhaust their tribal remedies before filing

suit in this Court.  As discussed above, it is likely that the Tribe lacks jurisdiction because

the Tribe failed to demonstrate that a *Montana* exception applies in this case.

Accordingly, adherence to the tribal exhaustion doctrine would serve no purpose other

than delay and therefore does not apply.  *Strate*, 520 U.S. at 459, n.14; *Nevada*, 533 U.S.

at 359-60.

**C.      Judicial Estoppel and Unclean Hands**

The Tribe asserts that the Utilities should be judicially estopped from arguing that

no Tribal permission is required for the Project because the Utilities have agreed that they

must obtain permission and compensate the Tribe for impacts to their treaty rights caused

by the Project in previous filings with the Public Utilities Commissions.  In the same

vein, the Tribe argues that the Utilities have acquiesced in the understanding that some

Tribal permission was required by entering into the Settlement Agreement, and under the

doctrine of unclean hands, cannot now claim that they had no obligation to obtain

permission to cross Reservation boundaries.

The Court concludes that the Utilities are not barred by either judicial estoppel or

the doctrine of unclean hands from asserting that no Tribal permission is required for the

Project.  The record demonstrates, and the Tribe acknowledges, that the Utilities have

consistently taken the position that because the project avoids crossing on or over tribal

trust land, no Tribal permission is required.  That the Utilities entered into the Settlement

Agreement (which the Tribe has consistently maintained is null and void) does not alter that position.

For the above reasons, the Court determines that the Utilities are likely to succeed in demonstrating that federal law precludes the Tribe from asserting any civil authority over the Utilities and the Project.  Thus it is also likely that the Utilities will succeed on the merits of their claim for a declaration that the Tribe lacks regulatory jurisdiction over the Utilities' transmission line activities at issue here.  Accordingly, this factor supports granting injunctive relief.

## III.   Irreparable Harm

The Utilities must establish that irreparable harm will result if injunctive relief is not granted and that such harm will not be compensable by money damages.  *See Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986).  A showing of speculative harm is insufficient to meet this burden.  *Id.*  Here, the record establishes that the Project is necessary to restore reliable utility services to the region.  Construction is scheduled to begin this summer and the Project has a 2012 deadline for completion.  Permitting the Tribe to assert authority over the Utilities with respect to the Project would likely result in delays or stoppages, which would ultimately affect the Utilities' ability to meet the needs of its electric service customers in the area.  Thus, the Court concludes that the Utilities have demonstrated that they will suffer irreparable harm absent an injunction.

## IV.   Balance of Harms and Public Interest

The Court concludes that any potential harm to the Utilities in not granting their request for injunctive relief outweighs any purported harm to the Tribe.  Moreover,

granting injunctive relief in this action would serve the public interest, as the public has an interest in upholding established federal law, ensuring uniformity in state and federal regulatory processes for approving utility lines not located on tribal lands, and in the timely completion of the Project.

## CONCLUSION

The Court continues to believe that it would be in the best interest of the parties to resolve this matter without further litigation and encourages the parties to continue in its attempts to do so. The Court is prepared to order a settlement conference with Magistrate Judge Leo I. Brisbois if the parties feel it would serve the interest of all concerned.

Based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS ORDERED** that:

1.      The Utilities' Motion for Temporary Restraining Order and Immediate Preliminary Injunctive Relief (Doc. No. [13]) is **GRANTED.**

a.      The Tribe shall cease and desist from asserting prescriptive and permitting jurisdiction over the Project and discontinue with any Tribal Court action asserting any prescriptive and permitting jurisdiction over the Project or otherwise interfering with the routing and construction of the transmission line.

Dated:  June 22, 2011                    s/Donovan W. Frank
                                         DONOVAN W. FRANK
                                         United States District Judge